**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-CR-162 (RBW)** |
| | : | |
| **TIMOTHY DELONTE WILLIAMS and** | : | |
| **JAEVONN ARCHER,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OMNIBUS**
**MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION**

Mr. Timothy Delonte Williams (hereinafter, "Defendant-1 (Williams)") and Jaevonn Archer (hereinafter, "Defendant-2 (Archer)") have been indicted by a federal grand jury for the violent kidnapping of Y.A. that occurred on February 25, 2024 (the "Kidnapping").  The government's evidence establishes that the two currently charged defendants, and one that is still on release and unknown to the government (collectively, the "Kidnappers"), used firearms to force Y.A. into the back of one of their vehicles in the District of Columbia.  They then bound Y.A.'s hands and feet with zip ties and wrapped duct tape around his eyes.  The Kidnapping lasted for several hours, during which the Kidnappers assaulted Y.A. until he divulged his apartment location in Virginia.  The Kidnappers then drove to Virginia while sitting on top of Y.A. to keep him from moving. Once they arrived, the Kidnappers proceeded to burglarize Y.A.'s Virginia apartment of over a period of multiple hours.  After Y.A. spent around five hours kidnapped in the back of a vehicle, the Kidnappers drove Y.A. to Maryland, where an eyewitness observed the Kidnappers dragging a "lifeless" body into Y.A.'s own vehicle. That witness ran to Y.A.'s aid and assisted him in calling authorities.

The government's investigation into the kidnapping culminated on April 9, 2024 (the "April 9 Operation") when five residences between the District of Maryland, Eastern District of

1

Virginia, and the District of Columbia were searched, and Defendant-1 (Williams), Defendant-2 (Archer) and Malik Williams (*see* 24-MJ-127 (ZMF)) were arrested.  Multiple vehicles related to the kidnapping, distribution amounts of narcotics and marijuana, and a small arsenal of firearms and ammunition were seized. And importantly, a significant amount of Y.A.'s personal belongings have been recovered.

The United States respectfully submits this omnibus memorandum in support of its oral motion for detention for both defendants pending trial under 18 U.S.C. §§ 3142(f)(1)(B) (felony involving maximum sentence of life imprisonment) and 3142(f)(1)(E) (felony involving possession of a dangerous weapon).  Pursuant to the 18 U.S.C. § 3142(g) factors analyzed below, there are no conditions or combination of conditions short of detention will ensure the safety of the community should these defendants be released.

## FACTUAL BACKGROUND

Over the past few decades, the collection of limited-edition sneakers has grown from niche interest to mainstream hobby.  With the rise of the sneaker came sneaker resellers who operate in the billion-dollar industry by purchasing sneakers for retail price and reselling them for hundreds (and sometimes thousands) over what they paid for the shoe from the retailer.[1]  These resellers often sell other limited-edition products, such as "Bearbricks," which is a brand of collectible designer bear figurines that come in multiple sizes.  Due to its limited releases from the manufacturer, there is an active resale market for both sneakers and Bearbricks.[2]  Limited edition

---

[1]  Leticia Miranda, *The Sneaker Bubble is Bursting Around Nike,* July 3, 2023, https://www.bloomberg.com/opinion/articles/2023-07-03/the-sneaker-bubble-is-bursting-around-nike (last visited Apr. 10, 2024).

[2]  *See, e.g.,* Oliver Vonderahe, *All About Bearbricks: The Ultimate Collectible*, Feb. 17, 2023 https://www.sothebys.com/en/articles/all-about-bearbricks-the-ultimate-collectible  (last visited Apr. 10, 2024).

sneakers and Bearbricks have one thing in common – their value comes from the fact they are nonfungible, and therefore easily identifiable.

One such reseller is Y.A., who stored most of his product at his residence in Virginia (the "Victim VA Residence") although he maintained a residence in Washington D.C. as well (the "Victim DC Residence"). When Y.A. was Kidnapped on February 25, 2024, the Kidnappers stole from the Victim VA Residence $100,000.00 in cash Y.A. had recently won from a casino, numerous legally owned firearms, between 200 and 300 pairs of sneakers, virtually all his clothing, Bearbricks, a gaming console, multiple pieces of Y.A.'s jewelry, and various other valuables.

<u>The Residences and Vehicles</u>

As part of its investigation, the government identified five residences and two vehicles the Defendants operated out of to commit the Kidnapping, all of which were searched or seized pursuant to the April 9 Operation. These residences operated as stash locations for Y.A.'s stolen property, while the vehicles were used by the Defendants to transport Y.A. himself and his stolen property.

At this posture of the case, the government may proceed by proffer and is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). However, it bears consideration that the April 9 Operation involved valid search warrants from E.D. Va., D. Md., and D.D.C., meaning Magistrate Judges in three different federal jurisdictions found probable cause that the below residences and vehicles were associated with the Kidnapping:

| Property |
| --- |
| "Archer Residence" Maryland |
| "Williams Residence 1" Virginia |

| "Williams Residence 2"<br>Maryland |
| --- |
| "Williams Residence 3"<br>District of Columbia |
| "Williams Residence 4"<br>Maryland |
| "Vehicle 1"<br>White Ford Van |
| "Vehicle 2"<br>Black Dodge Charger |

Due to the complexity of this case and the proffer of evidence contained herein, a summary timeline of the Kidnapping is included below:



1:04 AM — Victim Vehicle and Vehicle 2 enter garage at Victim DC Residence.

1:11 AM — Y.A. and Williams spend approx. 21 minutes inside a condo unit

1:36 AM / 1:40 AM — Vehicle 2 leaves with victim before Williams returns to condo unit and burglarizes it

1:57AM — Victim Vehicle, believed to be driven by Williams, leaves Victim DC Residence

3:01 AM — Williams and Archer fuel up Vehicles 1 and 2 at Citgo

3:35 AM — Vehicles 1 and 2 arrive at Victim VA Residence

3:45 to 6:09 AM — Williams and Archer burglarize Victim VA Residence for hours

6:13 AM — Vehicles 1 and 2 depart Victim VA Residence

6:45AM — Vehicles 1 and 2 enter rear alley of Williams Residence 3

7:07 AM — Y.A. is dragged from Vehicle 2 to Victim Vehicle in Capitol Heights

7:30 AM — Police locate victim in his vehicle

## Y.A. is Kidnapped in the District of Columbia

At 1:04 AM on the morning of the Kidnapping, Y.A.'s white Mercedes (the "Victim Vehicle") is seen on surveillance footage followed by Vehicle 2[3] entering the parking garage of Victim DC Residence.  Y.A. and Defendant-1 (Williams) are then seen taking the elevator from the garage and spending approximately twenty-two minutes in Y.A.'s apartment before taking the elevator to the garage at around 1:33 a.m.  The two are seen moving to an area of the garage that

---

[3] Vehicle 1 is registered to Defendant-1 (Williams).  Neither Defendants are the lawful occupant of Vehicle 2.  Vehicle 2 was reported stolen out of Alexandria, Virginia on February 5, 2024

does not have surveillance, and Y.A. is not seen again on camera until he is rescued by Prince George's County Police Department at 7:30 a.m. in Capitol Heights, Maryland.

Soon after Y.A. disappears, Vehicle 2 is seen leaving the garage at 1:36 a.m. (likely with Y.A. bound and duct-taped within).  At 1:40 a.m., Defendant-1 (Williams) returned to the elevator alone and is seen going to Y.A.'s apartment.  Defendant-1 (Williams) is seen making two trips from the garage to Y.A.'s apartment and back during which he is seen removing cardboard boxes and one large duffel bag. Defendant-1 (Williams) returns to the garage at 1:54 a.m. and Victim Vehicle is then seen leaving the garage at 1:57 a.m. In total, Defendant-1 (Williams) dragged four large cardboard boxes and one large duffle bag out of Y.A.'s apartment.

Y.A. provided a slightly different account of the events immediately prior to the Kidnapping.  Y.A. reported that an unknown individual contacted him on Instagram to purchase shoes, and that the two agreed to meet between 12:30 a.m. and 1:00 a.m. on February 25, 2024, in front of Victim DC Residence.  Upon arriving at the location, Y.A. saw an unknown man exiting out of a black Dodge Charger and the two began to discuss the sale of a specific pair of limited-edition "Travis Scott" Nike sneakers.  Moments later, two unknown subjects approached Y.A. displaying handguns and forced him into the back of the Charger before binding his hands and feet with zip ties and covering his eyes with duct tape.

Y.A. has remained consistent on what occurred once he was Kidnapped.  According to Y.A.'s account, he attempted to lift his head up but one of the Kidnappers sat on his body and forced his head down each time he attempted to do so. Y.A. furthermore stated that the Kidnappers demanded to know where Y.A. lived and struck him repeatedly with a gun while demanding the address. In fear that the subjects would go to the address on Y.A.'s license where his family members lived, he provided the address for Victim VA Residence. Prior to this case being

unsealed, Y.A. spoke to law enforcement and identified the Instagram account that contacted him initially as one that Instagram records show belong to Defendant-1 (Williams).

<u>Victim VA Residence is Burglarized</u>

Prior to departing the District of Columbia and after Y.A. was bound in the back of Vehicle 2, the Kidnappers stopped at a Citgo at 2300 Pennsylvania Avenue, Northeast, in Washington D.C. at around 3:01 a.m.   Both surveillance footage and cell site evidence[4] associated with the Defendants phone numbers place them at the Citgo, filling up gas for both Vehicles 1 and 2.  Once the Defendants finished filling up gas, surveillance footage shows both Vehicles departing from the Citgo, and cell site evidence from approximately 3:07 a.m. to 3:33 a.m. shows both Defendant's phones traveling from the Citgo towards Victim VA Residence.

At 3:35 a.m., surveillance video from a restaurant sharing the same address as Victim VA Residence shows Vehicles 1 and 2 by Victim VA Residence.  At 3:43 a.m., both Vehicles 1 and 2 park in front of Victim VA Residence and individuals consistent with Defendant-1 (Williams) and Defendant-2 (Archer) are seen interacting near Vehicle 2. From this surveillance video, law enforcement was able to determine the tag on Vehicle 1, and that Vehicle 1 was registered to Defendant-1 (Williams).

Surveillance footage shows at approximately 3:45 a.m., Defendant-1 (Williams) and Defendant-2 (Archer) enter Victim VA Residence through the main lobby entrance.  Defendant-1

---

[4] The Cell Site Evidence discussed in this memorandum involves the approximate location of the subject cell phone when it initiated contact with a particular cell phone company's network. Cellular phones use radio frequencies to communicate. When a cellular phone is "on," and not in "Airplane" mode, the cellular phone constantly scans its environment, evaluating and ranking which cell towers (sometimes referred to as cell sites) have the strongest signal. When a cellular phone places or receives a call, it will utilize the cellular tower and sector with the strongest signal. The tower with the strongest signal generally comes from the tower that is closest to the phone, or in its direct line of sight.

(Williams) is seen wearing a flat-brim hat, a dark zip-up hooded sweatshirt under a black North Face puffer coat, dark pants, white socks, dark shoes, and a blue latex glove. Defendant-2 (Archer) was wearing a black hooded sweatshirt, a black hat with white "AMIRI" brand on it, dark pants, and dark shows and light soles. Defendant-1 (Williams) is seen on surveillance carrying what appeared to be a box or other type of collapsible storage.   While the defendants, at times, had their hoods up, they were otherwise not masked during this ordeal.

At approximately 4:49 a.m., Defendant-1 (Williams) is seen walking out of Victim VA Residence carrying property in both of his hands. He is then seen opening the rear door of Vehicle 1 (a van that is best described as a construction van with large rear storage) before walking back into the apartment building pushing an empty dolly. Over the course of the next hours, the Defendants made multiple trips carrying what appeared to be Y.A.'s property out of the apartment building before appearing to load the property into Vehicles 1 and 2.  During this time period, Y.A. recalled being inside Vehicle 2 with an unknown Kidnapper sitting on him and forcing him to not move.  Screenshots from the surveillance footage are below, which show the quantity of items taken from Victim VA Residence:

 

**Figure 1: Defendant-1 (Williams) carrying property out to Vehicle 1 at approximately 4:49 AM.**




**Figure 2: Defendant-1 (Williams) with a full dolly of property at approximately 5:01 AM.**




**Figure 3: Defendant-1 (Williams) with a full dolly of property at approximately 5:16 AM.**



**Figure 4: Defendant-1 (Williams) with a full dolly of property at approximately 5:42 AM.**



**Figure 5: Defendant-1 (Williams) leaving with a full dolly of property at approximately 5:57 AM.**

According to Y.A., the Kidnappers demanded the code for his safe located in his apartment and continued to strike him with the gun until he provided the code. From the safe, the Kidnappers stole multiple firearms (which were legally owned by Y.A.) and over $100,000 in United States currency, which records show Y.A. won recently at MGM Casino in National Harbor. Due to the

quantity of items stolen from Victim VA Residence, a complete accounting of the items has yet to be completed.  However, in addition to the $100,000.00 and multiple firearms, between 200 and 300 pairs of shoes, virtually all of Y.A.'s clothing, Bearbricks, and multiple pieces of Y.A.'s jewelry were taken. Y.A. overheard the subjects say they "got a ticket," which he understood to mean "hit the jackpot" in his apartment.

At approximately 6:12 a.m., one of the subjects can be seen standing at an open passenger's side door of Vehicle 2 appearing to interact with the occupants.[5] He proceeds to close the door, walk back to Vehicle 1 and get into the driver's seat before the headlights on both vehicles illuminate. Surveillance video shows Vehicle 1 and Vehicle 2 then departed towards Maryland. Cell site evidence for Defendant-1 (Williams) and Defendant-2 (Archer) is consistent with what is observed on surveillance camera during this time.

Members of the Fairfax County Police Department ("FCPD") Crime Scene Section responded to Victim VA Residence and processed the scene. Forensic evidence, including latent fingerprints, was collected from inside the apartment. On March 2, 2024, a representative from the FCPD Crime Scene Section notified the United States that a fingerprint photographed and lifted from the front right side of Y.A.'s television screen matched the known print of Defendant-2 (Archer). Of note, Y.A. reported that he had a gaming console mounted on the wall behind the television, which was stolen during the Kidnapping (and was subsequently recovered during the April 9 Operation).

<u>Proceeds of the Kidnapping are Stashed in Williams Residence 3</u>

---

[5] As described in full below, the Kidnappers used CashApp to send money to themselves.  A CashApp transaction occurred at 6:12 a.m. between Y.A.'s account and a CashApp account registered to Defendant-2 (Archer).

After leaving the Victim VA Residence, Y.A. recalled that they drove for at least thirty more minutes before stopping at an unknown location to unload the items they had stolen from his apartment. During this time, Y.A. overheard the subjects discussing what to do with him.

Cell site evidence places Defendants around Williams Residence 3 after leaving the Victim VA Residence. Surveillance footage corroborates this, as Vehicles 1 and 2 are seen driving into the rear alley of Williams Residence 3 at 6:44 a.m.  The rear alley features a walking path that provides direct access to Williams Residence 3.

As discussed more below, a majority of Y.A.'s property was recovered from this location during to the April 9 Operation.

<u>The Kidnappers CashApp Themselves $1,000.00</u>

At some point before releasing Y.A., one of the Kidnappers sent $1,000 to themselves via CashApp from Y.A.'s phone.  Y.A. recalled that the Kidnappers stated they had an "alias" CashApp account, meaning that the account was not in the Kidnapper's real name.  Subpoena returns show $1,000 was sent from Y.A.'s CashApp account at 6:12 a.m. on the date of the Kidnapping to an account registered to Defendant-2 (Archer), featuring his real date of birth, social security number, and cell phone number used to create the cell site evidence discussed herein. Furthermore, CashApp requires account users to submit a valid form of identification, and those records show a D.C. identification card belonging to Defendant-2 (Archer).

A tracing of Defendant-2 (Archer)'s CashApp activity shows Defendant-2 (Archer) then sent money at 11:47 and 11:48 a.m. that same day to a CashApp account that has been linked to Defendant-1 (Williams)'s real name, social security number, date of birth, and phone number connected to Defendant-1 (Williams)'s Instagram account.

<u>Y.A. is Left in Victim Vehicle, Still Bound, in Maryland</u>

Y.A. was ultimately driven by the subjects to District Heights, Maryland where he was forced back into his own Mercedes while still bound. From the time he was kidnapped in Washington D.C. to the time he was dropped off in Maryland, he did not leave the back seat of the Vehicle 2. Before releasing Y.A., the Kidnappers deleted all contents from Y.A.'s cell phone phone, including removing pictures and messages from Y.A.'s Instagram account and removing his credit cards from Apple Pay.

Prince George's County Police ("PGPD") officers responded to a distress call at in District Heights, Maryland, at approximately 7:15 a.m. on February 25, 2024. At approximately 7:30 AM, PGPD found Y.A. blindfolded and bound with zip ties inside Y.A.'s Mercedes.  PGPD body worn camera ("BWC") footage, shows Y.A. sitting in the Victim Vehicle while PGPD frees him from the zip ties before cutting away the duct tape around his eyes and head. The BWC footage also shows a witness on scene who was attempting to assist Y.A. Law enforcement subsequently identified and interviewed this witness, who stated that on the morning of February 25, 2024, they were standing outside of their apartment when they saw a white Mercedes or BMW pull into the block and park. A person got out of the white vehicle and into another vehicle. From the second vehicle, the witnesses observed unknown individuals dragging what appeared to be a lifeless person and place him in the white vehicle. The unknown individuals then returned to the second vehicle and left the area. The witness approached the white vehicle and found Y.A. bound with his eyes covered. The witness urged Y.A. to unlock the door, which ultimately opened from the inside, and the witness was able to call 911 from Y.A.'s phone.

<u>Defendant-2 (Archer) Celebrates the Kidnapping</u>

During a review of call records associated with the Defendant-2 (Archer)'s phone number multiple calls were made to the D.C. jail shortly after Y.A. was discarded in his vehicle. Call

records from the D.C Jail shows Defendant-2 (Archer) making numerous calls with an inmate (the "Inmate").

On February 25, 2024 at 9:49 a.m. (a little over two hours after Y.A. was discovered in his Mercedes), Inmate called Defendant-2 (Archer)'s phone number and asked whether Defendant-2 (Archer) knew someone who had a bank account.  In response, the male voice using Defendant-2 (Archer)'s phone number stated he did not, but "that little shit I was telling you about went through" and that he had some money for Inmate.  The male voice using Defendant-2 (Archer)'s phone number then asked Inmate to call back in thirty minutes.  On February 25, 2024, at 11:43 a.m., Inmate called Defendant-2 (Archer)'s phone number back.  During this conversation, the male voice using Defendant-2 (Archer)'s phone number stated that they had around two hundred (200) boxes of shoes and a "whole bunch" of AirPods (as discussed more below, a large quantity of AirPods were recovered during the April 9 Operation).  The male voice using Defendant-2 (Archer)'s phone number also communicated that he was still in the middle of separating all the items that he had just come into possession of and said with a laugh, "I don't even know. I couldn't even say it looks like Christmas in this mother fucker…it looks like I don't know, boy…it look like, it look like mother fucking [indiscernible] had a sale…this shit is ridiculous…I got some Alexanders today, I got some mother fucking Diors...I got a Moncler coat today…"

Evidence shows that Defendant-2 (Archer) wore Y.A.'s Moncler coat later that evening while dining out at a restaurant.  The evening of the Kidnapping, a card associated with Defendant-2 (Archer)'s CashApp account made a $299.83 purchase completed with Apple Pay at "TST* ALERO U ST" on February 25, 2024 at 7:32:06 p.m.  Surveillance video from Alero Restaurant located at 1301 U Street Northwest, Washington, D.C. 20009 showed Defendant-2 (Archer) enter the restaurant with a group at approximately 6:06 p.m. Defendant-2 (Archer) is wearing a black

hooded sweatshirt and that are consistent with the black hooded sweatshirt and black AMIRI cap worn by him while he was burglarizing Victim VA Residence earlier that morning.   At approximately 7:31 p.m., Defendant-2 (Archer) can be seen tapping a cell phone on a device held by the waiter, consistent with the way an Apple Pay transaction is often completed. At 7:32 p.m. Defendant-2 (Archer) is seen making selections on the waiter's device with his finger and possibly leaving a signature. Alero Restaurant staff provided the United States with the digital receipt associated with this transaction, which revealed a total of $299.83, the exact amount reflected in the CashApp records. Finally, the Moncler coat worn by him at Alero restaurant is identical to a coat that Y.A. is seen wearing on his own Instagram page, which was stolen from his apartment during the Kidnapping. This Moncler coat was recovered during the April 9 Operation.

 

**Figure 6: On the left, Defendant-2 (Archer) is seen at Alero Restaurant wearing an AMIRI cap and Moncler jacket at approximately 6:06 PM on February 25, 2024. On the right, circled in red, Defendant-2 (Archer)'s hat at Victim VA Residence on the morning of February 25, 2024.**

 

**Figure 7: Defendant-2 (Archer), circled in red appearing to tap a phone to complete a transaction at Alero Restaurant at approximately 7:31-7:32 PM on February 25, 2024.**

The April 9 Operation

On April 9, 2024, shortly after 6 a.m., all five residences were searched and Vehicles 1 and 2 were seized. At the time of this writing, law enforcement has not completed an accounting of the hundreds of pieces of evidence seized from each of the residences, and Vehicles 1 and 2 are scheduled to be searched after a detention hearing in this matter.

Accordingly, the below summary is underinclusive of the evidence seized from the April 9 Operation.

*Archer Residence*

The Archer Residence is a house with multiple rooms. Based on cell phone GPS data, Defendant-2 (Archer) is known to have spent most of his evenings at this address after the Kidnapping, and Archer was arrested at this residence.

In a room shared by Defendant-2 (Archer) and a female associate, (3) cell phones[6] were recovered, one of which was bent in half. It is the preliminary assessment that Defendant-2 (Archer) smashed this cell phone as law enforcement made entry into the Archer Residence. A

---

[6] Numerous additional cell phones were seized during the April 9 Operation but are not otherwise discussed herein.

green camouflaged backpack was seized, where a loaded Glock 26 pistol with an extended magazine was located, along with Defendant-2 (Archer)'s wallet, identification card, suspected marijuana, and a digital scale.  Additional firearm paraphernalia was recovered from this room, including a butt stock for a firearm, and loose 9-millimeter ammunition. Narcotics were recovered as well, including approximately thirty-five (35) grams of greyish blue pill that tested positive[7] for a Schedule I synthetic opioid Metonitazene in a prescription bottle that did not belong with Defendant-2 (Archer).  Finally, multiple boxes of shoes were recovered from this room.

In a currently unoccupied nursery, law enforcement recovered a suitcase containing a duffel bag with two firearms: a Sig Sauer MCX pistol that was stolen from Y.A.'s apartment during the Kidnapping as well as a Glock 30 pistol.  A loaded magazine was also contained within, which was not equipped to the Glock 30 at the time of recovery.  A red dot scope designed for a firearm was found within this room. Y.A.'s Moncler coat, which Defendant-2 (Archer) wore to Alero restaurant the night of the Kidnapping was also recovered in this nursery, as well as the black AMIRI cap Defendant-2 (Archer) was seen wearing at the restaurant at Victim VA Residence.

*Williams Residence 1*

At the outset, Vehicles 1 and 2 were seized from this residence.  This residence is two-bedroom apartment with only one bedroom currently occupied (at the time of the search, the other bedroom was bare and had no furniture in it).  From a closet by the front door law enforcement seized a suitcase containing a bag.  Within that bag, law enforcement recovered six (6) firearm magazines, all loaded with ammunition.  Four (4) of those magazines were rifle magazines, and two (2) were Glock magazines. A bag of loose rifle ammunition was recovered as well. The dolly

---

[7] A subsequent laboratory test of this drug will be performed at a later date.

used to transport Y.A.'s property out of the Victim VA Residence was recovered, as well as a black cap consistent with what Defendant-1 (Williams) was wearing during the Kidnapping.

Various identification cards belonging to Y.A. were recovered, including his identification card, bank cards, and his concealed carry permit. Finally, one pair of blue latex gloves appearing the same as the one Defendant-1 (Williams) wore to the Kidnapping was recovered as well.

*Williams Residence 2*

This residence is a 1-bedroom apartment and is where Defendant-1 (Williams) was arrested. In the front of the apartment, law enforcement recovered a Louis Vuitton satchel containing jewelry belonging to Y.A. Another Louis Vuitton branded backpack (which law enforcement viewed Defendant-1 (Williams) wearing on multiple occasions prior to the Operation) was recovered, and contained a Springfield Armory pistol, loaded with eight (8) rounds of nine-millimeter ammunition. Also contained within was some amounts of suspected marijuana. Three (3) Bearbricks were recovered, as well as three (3) pairs of shoes (including a pair of shoes worn by Defendant-1 (Williams) during the Kidnapping).

Within the bedroom, law enforcement recovered a maroon duffel bag containing $71,054.00 bundled into separate $1,000.00 bands. A safe was located within the bedroom, which contained another $9,062.00.

Within the bathroom, a pair of black pants were recovered, inside of which contained Defendant-1 (Williams)'s wallet. That wallet included his identification card, CashApp card matching the CashApp account used to receive money from Defendant-2 (Archer), and $3,816.00.

Finally, a vehicle that is not Vehicle 1 or Vehicle 2 was seized at this residence. Within that vehicle was paperwork with Defendant-1 (Williams)'s name on it, a prescription bottle with

Y.A.'s name on it, eleven (11) boxes of shoes, suspected marijuana, and a device that is used to reprogram key fobs for vehicles.

*Williams Residence 3*

This residence is a multi-bedroom residence, where Malik Williams[8] (believed to be the relative of Defendant-1 (Williams)) was arrested. From within this residence, dozens of boxes of shoes were seized in every single room. Due to the quantity of evidence recovered from this location, law enforcement has not yet completed an accounting of all the shoeboxes recovered from this location.

In the bedroom of Malik Williams, law enforcement recovered a FNH Fifty-Seven pistol loaded with one round of ammunition in the chamber and additional rounds in the chamber. This firearm was one stolen from Y.A. during the kidnapping, and was found in between the mattress and box spring that Malik Williams was on at the time of the search. $731.00 and the ID card for Malik Williams was recovered from the bed as well. Nearby, law enforcement also discovered a magazine matching the FNH pistol, containing the same caliber of ammunition. Five bags of marijuana totaling approximately 11.23 pounds was seized.

In a separate bedroom occupied by a relative of Malik Williams, law enforcement recovered a PlayStation 5 gaming console, as well as $600.00.

*Williams Residence 4*

This residence is a two-bedroom house, where one of the bedrooms was locked.

Within the locked bedroom, law enforcement recovered court documents with Defendant-1 (Williams)'s name on it. While no firearms were seized from this residence, a sixteen (16) round

---

[8] Malik Williams has been charged by Complaint with one count of violating 18 U.S.C. § 922(g)(1). *See see* 24-MJ-127 (ZMF).

capacity magazine, Remington ammunition, and an American Tactical AR magazine loaded with ammunition was recovered.  Furthermore, thirty-seven (37) counterfeit pills testing[9] positive for N, N-Dimethylpentylone (a schedule 1 controlled substance, sometimes referred to as "Boot") was recovered, as well as a digital scale.

Within the unlocked room, law enforcement recovered an empty black long gun bag, a second empty gun box under the couch, rifle ammunition, a pistol loader, a shopping bag filled with eighteen (18) unopened boxes of Apple AirPods, and a shoebox with $7,035.00.  Multiple boxes of shoes were recovered.

## ARGUMENT

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of any other person and the community," the Court shall order a defendant held pending trial. 18 U.S.C. § 3142(e).  The Act provides, however, for certain crimes, that there is a rebuttable presumption that no conditions or combinations of conditions will assure the safety of the community.  *See id.* The crimes triggering such rebuttable presumptions need not be expressly included in the charging instrument.  *See United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (holding that "the complaint need not allege a violation of one of the particular predicate offenses for the presumption to come into play.")  Instead, "[if] the facts establish probable cause that the defendant has [committed such an offense], the judicial officer should give proper weight

---

[9] A subsequent laboratory test of this drug will be performed at a later date.

to Congress's general factual view that the defendant poses an unreasonable risk of danger to the community when applying the § 3142(g) factors." *Id.*

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

I.     **The Nature and Circumstances of these Offenses Merit Detention.**

The nature and circumstances of this case weigh heavily in favor of detention. The charged defendants are alleged to have orchestrated and executed a kidnapping spanning three federal jurisdictions that lasted over six hours. Before the kidnapping even began, the charged defendants arrived prepared with zip ties and duct tape to restrain the victim, a latex glove to hide forensic evidence, and a dolly, a collapsible storage unit, and a white van (Vehicle 1), all of which are

designed to carry Y.A.'s property away.  And indeed, Defendant-2 (Archer)'s statements over jail calls the morning of the Kidnapping shows that their abduction was planned well in advance ("that shit I was telling you about. . ."). The conduct alleged in the Indictment was not a momentary lapse of judgment – it rather represents a coldness to human life that strongly weighs in favor of detention.

Second, the Kidnapping itself was performed in an extraordinarily violent fashion. Y.A. has remained consistent that while he was bound and duct-taped, the Kidnappers beat him repeatedly with a firearm in order to gain his compliance for information about his residence and his safe.  And furthermore, that a third Kidnapper, currently unidentified by the government, was seated on top of Y.A. during the entire multi-hour ordeal while Defendant-1 (Williams) and Defendant-2 (Archer) burglarized the Victim VA Residence.  Again, such actions show the nature of the offense was deliberate, prolonged, and violent.

Finally, the Kidnappers' behaviors after the Kidnapping also counsel this Court to hold both defendants, as a basic review of the evidence from the April 9 Operation shows the Defendants were as coordinated before the Kidnapping as they were after. The Defendants appear to have taken Y.A.'s personal property and enriched themselves by spreading it through five different residences.  Defendant-2 (Archer), in addition, demonstrated a complete lack of remorse for his conduct by bragging about the items he stole on jail calls and spent Y.A.'s money at a dinner outing the same evening of the Kidnapping.  Furthermore the government suspects that Defendant-2 (Archer) destroyed evidence at the moment he realized the government made entry into his home. It is also important to note that between the five residences, the Defendants possessed a small arsenal of firearms (only two of which have so far been identified as Y.A.'s property) and distribution amounts of illegal drugs.

This factor weighs heavily in favor of detention.

## II.    The Weight of the Evidence Against the Defendants is Overwhelming.

The evidence against these two Defendants is overwhelming, which weighs in favor of pretrial detention.[10]  *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *10 (D.D.C. Feb. 6, 2023). ("[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true.").

Even at this early stage of the case - where DNA evidence has not yet been processed, the numerous phones seized have not been searched, and Vehicles 1 and 2 have not yet been opened - virtually every source of evidence has pointed towards the Defendants' guilt in this matter. Surveillance evidence has captured the entire timeline of the kidnapping (including the days before and after the incident, which is not discussed herein), which is further strengthened by cell site evidence derived from phone numbers traced back to the Defendants through numerous forms of corroboration as well as the CashApp accounts that received Y.A.'s money.   That same surveillance and cell site evidence led law enforcement to five residences, where Y.A.'s property (including identification cards and firearms registered to Y.A.) was found divided between all of

---

[10] This factor should be given equal weight in the Court's analysis of the § 3142(g) factors. In *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, then Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194, at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

them. And even at this early stage of the case, forensic evidence has tied Defendant-2 (Archer) to a fingerprint found in Y.A.'s burglarized apartment. Finally, when viewed with the totality of the evidence, jail calls from Defendant-2 (Archer) amount to an admission of guilt as to his participation in the Kidnapping.

This factor weighs heavily in favor of detention.

### III.    The Defendants' History and Characteristics Merit Detention.

Both Defendants come before the Court with significant criminal histories.

Defendant-1 (Williams) has been arrested at least eleven times and has three prior felony convictions, two of which are a prior firearm conviction and robbery conviction from Maryland. Defendant-1 (Williams) was convicted of Robbery on February 8, 2019, and served a term of imprisonment of fifteen (15) years, with thirteen (13) years and six (6) months suspended. According to the pretrial services report for Defendant-1 (Williams), he was removed from supervised probation for this matter as recently as November 5, 2022. Importantly, Defendant-1 (Williams) appears to have violated probation in both of his felony convictions. With respect to his 2016 firearm conviction in Upper Marlboro, Maryland, Defendant-1 (Williams)'s probation term expired unsatisfactorily due to his arrest and conviction in the Robbery matter.   For his violation of probation, he served an additional one year of incarceration, consecutive to the Robbery sentence.

Defendant-2 (Archer), on the other hand, was actively under supervision in Prince George's County, Maryland for assaultive and firearms-related offenses at the time of this Kidnapping. He comes before the Court with seven prior arrests, one bench warrant for failing to appear, and four prior felony convictions. His criminal history begins in 2012, when he was convicted of assault and possession of a firearm in Prince George's County (his probation expired

unsatisfactorily there because he was found in violation). He then was convicted in 2018 of a misdemeanor offense in D.C. Superior Court's domestic violence division, and failed to appear for court, forcing the court to issue a bench warrant for his arrest.  Finally, he was convicted of 1st Degree Assault in Maryland, Possession of a Firearm, and Motor Vehicle Theft on October 5, 2018, and received a lengthy sentence of twenty years with execution of sentence suspended as to all but seven years, followed by five years of probation.  Accordingly, Defendnat-2 (Archer)'s term of supervision began on December 9, 2022, and is set to expire on that same date in 2027.

Collectively, through the Defendants' history of violent offenses and firearms possession, we see a clear pattern of escalating criminality that appears to have come to a head as they committed the Kidnapping before this Court.  This should be viewed in combination with their characteristics, which show both Defendants lived amongst distribution amounts of drugs and a small arsenal of firearms.  And additionally, the characteristics of the Defendants are illuminated by the premeditated and brazen nature of this Kidnapping.  In view of the totality of information available to this Court, this factor weighs strongly in favor of detention.

### IV.    Both Defendants Present a Danger to Our Community.

Both Defendants present an acute danger to the members of our community, should they be released.  The impacts of their actions are, as of now, unquantifiable.  For example, the government understands that only a small portion of Y.A.'s firearms have been recovered during the April 9 Operation, meaning the Defendants likely sold stolen firearms between the Kidnapping and the date of their arrest. It is likely that some of these firearms may not be recovered until they appear at a crime scene.

These Defendants have both demonstrated a willingness to go to great lengths to plan and execute a criminal conspiracy that required the physical restraint of a victim for over five hours.

The extraordinary violence involved in this Kidnapping, in combination with both of their prior violent and firearm convictions, demonstrates the risk to the public posed by each of these individuals. And furthermore, their willingness to go to such lengths to possess items like sneakers and luxury clothing further supports the conclusion that Defendant-1 (Williams) and Defendant-2 (Archer) are simply too dangerous to remain on release as this case resolves. There is a high likelihood that both Defendants will immediately re-engage in dangerous criminal conduct if they are placed on pretrial release.  As such, this factor weighs heavily in favor of detention.

## **CONCLUSION**

For these reasons, Defendant-1 (Williams) and Defendant-2 (Archer) and should be detained pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Justin F. Song*
JUSTIN F. SONG
Assistant United States Attorney
N.Y. Attorney No. 5626379
601 D Street NW
Washington, D.C. 20530
(202) 227-9019
Justin.Song@usdoj.gov